**The Keeton Firm LLC**
Steffan T. Keeton
100 S Commons, Ste. 102
Pittsburgh PA 15212
Tel: (888) 412-5291
stkeeton@keetonfirm.com

*Counsel for Plaintiff and the Proposed Class*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF ILLINOIS

BENTON DIVISION

| | |
|---|---|
| Larry Clark, individually, and on behalf of those similarly situated,<br><br>     Plaintiff,<br><br>  v.<br><br>McDonald's Corporation,<br><br>     Defendant. | CASE NO. 3:22-cv-628<br><br>**CLASS ACTION COMPLAINT**<br><br>**Demand for Jury Trial** |

# CLASS ACTION COMPLAINT

Plaintiff Larry Clark brings this action, individually and on behalf of all others similarly situated, against Defendant McDonald's Corporation. Plaintiff makes the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

# NATURE OF THE ACTION

"The **safety and quality** of our food is a top priority and we are constantly innovating to strive to meet and exceed our customers' expectations." [1]

"**Providing safe food** is our number one priority and a responsibility that we take seriously. Our customers expect McDonald's to maintain food safety standards and protocols and we're working hard to ensure we always meet those expectations."[2]

*McDonald's Corporation*

1.       Plaintiff brings this class action lawsuit on behalf of himself and similarly situated consumers ("Class Members") who purchased for personal, family or household use certain food products ("Products")[3] which are unfit for their

---

[1] McDonald's 2021 Notice of Annual Shareholders' Meeting and Proxy Statement, "Our Impact and Brand Purpose" at 10 (emphasis added). https://www.sec.gov/Archives/edgar/data/63908/000120677421001039/mcd_courtesy-pdf.pdf (filed April 8, 2021).

[2] McDonald's website, "Food Quality and Sourcing: Food Safety," https://corporate.mcdonalds.com/corpmcd/our-purpose-and-impact/food-quality-and-sourcing/food-safety.html (emphasis added).

[3] Products as used herein means the food item as well as any and all containers, wrappers, and packaging used to package, seal, protect, or deliver the food item to the consumer. The action concerns all McDonald's Products that contain PFAS, including but not limited to: the Big Mac, Chicken McNuggets, Cookies, and French

intended use because they contain unsafe per- and polyfluoroalkyl substances ("PFAS").

2.      The Products are formulated, designed, manufactured, advertised, distributed, prepared, sold, and delivered by Defendant to consumers, including Plaintiff, throughout the United States.

3.      Defendant is one of the largest restaurants in America with annual sales of $23 Billion.[4]

4.      With a brand built by celebrity endorsements including Kanye West, Bill Simmons, Heidi Klum, and Michael Jordan, Defendant operates and distributes its Products in all 50 states and sells over 1,500,000 Big Macs every day.[5]

5.      The Big Mac is McDonald's best-selling product. It was created in 1967 at the McDonald's restaurant on McKnight Road in Ross Township, Pennsylvania and debuted at the McDonald's restaurant in Uniontown, Pennsylvania as a way to feed hungry steelworkers. [6] It now has a museum dedicated to it, and to celebrate its 25th anniversary, the City of Pittsburgh renamed itself "Big Mac, USA."[7]

---

Fries. These particular Products have been independently tested and found to contain PFAS. Discovery will reveal the exhaustive list of substantially similar and defective McDonald's products that are included in this action.

[4] Julie Creswell, *McDonald's, now with higher prices, topped $23 billion in revenue in 2021,* NEW YORK TIMES (Jan. 27, 2022), https://www.nytimes.com/2022/01/27/business/mcdonalds-earnings.html.

[5] William Grimes, *Michael James Delligatti, Creator of the Big Mac, Dies at 98,* NEW YORK TIMES (Nov. 30, 2016), https://www.nytimes.com/2016/11/30/business/michael-james-delligatti-creator-of-the-big-mac-dies-at-98.html.

[6] Barbara Vancheri, *Golden Arch Angel*, PITTSBURGH POST GAZETTE (May 4, 1993).

[7] Hollis Johnson, *An ode to the Big Mac:*, BUSINESS INSIDER (Jul. 16, 2017), https://www.businessinsider.com/why-the-mcdonalds-legendary-big-mac-is-americas-burger-2017-7.

6.      It is known as America's most popular hamburger, and has been described as "an American institution, like Johnny Appleseed."[8]

7.      Unfortunately, each time an American buys a Big Mac, they are exposed to high levels of  PFAS.

8.      PFAS are a group of synthetic chemicals known to be harmful to both the environment and humans.

9.      PFAS are known as "forever chemicals" because the carbon-fluorine bonds in PFAS are extremely strong and thus are not appreciably degraded under environmental conditions. The continued use of PFAS is, by their nature, unsustainable, because it will necessarily lead to a greater concentration of PFAS in the environment. In some case, PFAS will survive over 1000 years.

10.     Exposure to PFAS can be incredibly devastating to vulnerable populations including young children and pregnant women. PFAS are capable of crossing the placenta, meaning pregnant women transfer PFAS to their unborn children. Women exposed to PFAS during pregnancy have higher risks of gestational diabetes and pre-eclampsia, and their babies are more likely to undergo abnormal growth in utero, leading to low birth weight, and later face an increased risk of childhood obesity and infections.

11.     Because PFAS persist and accumulate over time, they are harmful even at very low levels.

---

[8] Amy Wallace, *Big Mac mythos is a state of mind on a sesame bun*, The Baltimore Sun (Jan. 18, 1994),  https://www.baltimoresun.com/news/bs-xpm-1994-01-18-1994018112-story.html.

12.     Scientists are studying—and extremely concerned about—how PFAS affect human health and how the risks may be underestimated. The CDC outlined "a host of health effects associated with PFAS exposure, including cancer, liver damage, decreased fertility, and increased risk of asthma and thyroid disease."[9]

13.     Of particular concern is the use of PFAS in food product packaging because of the likelihood of migration into fast food.

14.     For example, foods that have high levels of sodium and fat – like Defendant's Products - have strong likelihoods of PFA migration from the food product packaging.[10]

15.     The use of PFAS in its Products stands in stark contrast to McDonald's brand identity which espouses food safety. In almost every medium, McDonald's Corporation tells consumers, investors, and the general public that the Products are safe.

16.     Defendant represents that the Products are safe and effective for their intended use, and reasonable consumers expect that Products marketed and sold to be ingested will not contain dangerous, synthetic chemicals like PFAS. Contrary to Defendant's representations, the Products are not safe because they contain PFAS, which have a negative impact on the health of humans.

---

[9] Harvard T.H. Chan Sch. of Pub. Health, *Health risks of widely used chemicals may be underestimated* (June 27, 2018), https://www.hsph.harvard.edu/news/hsph-in-the-news/pfas-health-risks-underestimated/.
[10] Ramírez Carnero A, Lestido-Cardama A, Vazquez Loureiro P, Barbosa-Pereira L, Rodríguez Bernaldo de Quirós A, Sendón R., *Presence of Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS) in Food Contact Materials (FCM) and Its Migration to Food*, FOODS 2021;10(7):1443. Published 2021 Jun 22.

17.     While consumers expect their food to be free of harmful toxins, McDonald's Corporation goes further and  represents that "[w]e integrate it [food safety] into every aspect of our operations – from food sourcing and menu development to packaging, distribution and logistics, and the daily running of our restaurants."[11] Defendant certifies these food safety standards from "farm to fork."[12]

18.     Even though McDonald's Corporation has been using PFAS in its Products for decades, it repeatedly denied that PFAS were used in the Products. Only recently in 2021, McDonald's Corporation admitted that PFAS are used in the Products.

19.     Instead, Defendant represented – and continues to represent - that its Products are safe, high quality, and appropriate for consumption.

20.     However, Defendant fails to tell consumers that PFAS, which can have adverse effects on humans and can bioaccumulate in human's bodies, are present in high levels in its Products. Even very low levels of PFAS can be toxic to humans.

21.     For the last three decades, Defendant's Products have been misleadingly represented, marketed, and advertised because Defendant failed to disclose the presence of PFAS in its Products. This failure to warn injured reasonable consumers, including Plaintiff, who reasonably relied upon Defendant's misleading representations that its Products were safe. Had Plaintiff and the putative Class Members known that McDonald's Products contained PFAS, they would not have purchased the products and/or would have paid less for them.

_____

[11] McDonald's, *supra* note 2.
[12] *Id.*

22.     McDonald's Corporation is one of the largest companies in America, and is valued in excess of $200 billion.

23.     It has the resources to comply with its representations and produce a Product safe for consumption. However, it intentionally chooses to include PFAS in its Products in an effort to further boost profits by cutting costs while also increasing sales by concealing the presence of PFAS in its Products.

24.     This "profits over people" approach allows McDonald's Corporation to save pennies per unit sold, and instead pass these "costs" at a far greater rate onto generations of consumers that must live with the consequences of McDonald's willful inclusion and concealment of dangerous PFAS in McDonald's Products.

25.     The Products Plaintiff and Class Members purchased are either worthless or worth less than the purchase price because Defendant failed to disclose that they contain PFAS which are dangerous to the health of the consumer and to the environment. Plaintiff seeks damages and equitable remedies on behalf of himself and the proposed Classes, defined herein.

## PARTIES

26.     Plaintiff Larry Clark resides in Illinois, as he did at all relevant times during the conduct alleged in this Complaint.

    a. During the last ten years, and as recently as January 2022, Mr. Clark has routinely visited McDonald's establishments throughout the United States, and primarily in Illinois where he purchased the Products for personal consumption. In Illinois, Mr. Clark's purchases have primarily been in this District and have included purchases in

Effingham County, Jackson County, Madison County, and Saint Clair County.

27.     Defendant is a Delaware corporation with its principal place of business in Chicago, Illinois.

## JURISDICTION AND VENUE

28.     This Court has personal jurisdiction over Defendant. Defendant purposefully avails itself of the Illinois consumer market and distributes the Products to many locations within this District and hundreds of retail locations throughout the State of Illinois, where the Products are purchased by thousands of consumers every day. Further, Defendant's principal place of business is located within the State of Illinois.

29.     This Court has original subject-matter jurisdiction over this proposed class action pursuant to 28 U.S.C. § 1332(d), which, under the provisions of the Class Action Fairness Act ("CAFA"), explicitly provides for the original jurisdiction of the federal courts in any class action in which at least 100 members are in the proposed plaintiff class, any member of the plaintiff class is a citizen of a State different from any defendant, and the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs. Plaintiff alleges that the total claims of individual members of the proposed Class (as defined herein) are well in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs.

30.     Venue is proper in this District under 28 U.S.C. § 1391(a). Plaintiff's purchases of Defendant's Products, substantial acts in furtherance of the alleged improper conduct, including the dissemination of false and misleading information regarding the nature, quality, and/or ingredients of the Products, occurred within this District and the Defendant conducts business in this District.

31.     Venue is in the Benton Division of this District because a substantial part of the events or omissions giving rise to the claim occurred in Effingham County and Jackson County, i.e., Plaintiff's purchases of the Products and his awareness of the issues described herein.

## FACTUAL ALLEGATIONS
### A.     McDonald's Tells Consumers Its Products Are Safe

32.     Consumers inherently expect that food products are safe for consumption.

33.     Defendant goes further, and assures consumers that its Products are safe through a widescale marketing campaign and focused brand building.

34.     In almost every arena – from shareholder meetings to magazine features to advertising – Defendant prominently represents that it has effective systems that ensure its Products are safe.

35.     In fact, Defendant tells consumers that "[p]roviding safe food is our number one priority and a responsibility that we take seriously."[13]

36.     Defendant knows that "customers expect McDonald's to maintain food safety standards and protocols and we're working hard to ensure we always meet those expectations."[14]

---

[13] McDonald's, *supra* note 2.
[14] *Id.*

37.     To build upon consumers' desire for food safety, the company assures consumers that its focus on food safety is not new and claims that it "has been at the core of everything we do for decades."[15]

38.     Defendant claims that its focus on safety is not limited to just a single aspect of the consumer's experience, and rather, "[w]e integrate it into every aspect of our operations – from food sourcing and menu development to packaging, distribution and logistics, and the daily running of our restaurants."[16]

39.     In other words, McDonald's Corporation assures consumers that they are safe – "from farm to fork" – at every stage of their experience with the Product.[17]

40.     Former Director of Quality Systems, Lamont Rumbers states, "Food safety is a never-ending process for McDonald's, from raw materials, through the facilities and distribution centers, and all the way to the restaurants…it's a top priority at McDonald's. It's a fundamental standard of our business and our heritage, and will never be compromised."[18]

41.     McDonald's Corporation is known for its management and focus on every stage of the supply chain. It also purports to apply intensive food safety standards to each stage.

---

[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *Id.*

42. As one article describes: [19]

a. "At the center of the McDonald's operation is a supplier food safety and quality assurance program that ranks as a corporate top priority. Suppliers and franchisees must follow rigorous quality and safety guidelines if they want to work with McDonald's, because in a high-profile business that bases success on a consistent customer experience no matter where you are in the world, setting explicit food safety and quality expectations for suppliers and restaurant employees is the only way to make it work."

b. "McDonald's quality assurance personnel talk daily with each supplier about their processes, discussing expectations, challenges and ideas for improvement."

c. "All suppliers must be willing and able to meet McDonald's stringent food safety and quality standards, which include dedicated production lines, storage facilities and production formulas. The McDonald's system requires constant quality checks throughout the supply chain process and proven traceability programs, at least one step back to the ingredient supplier, and in some cases, tracking all the way back to the farm. The suppliers are expected to audit their own ingredient and raw material suppliers to ensure that those producers upstream also meet

---

[19] Sarah Fister Gale, *McDonald's USA: A Golden Arch of Supply Chain Food Safety*, FOOD SAFETY MAGAZINE (Feb. 1, 2006), https://www.food-safety.com/articles/4639-mcdonalds-usa-a-golden-arch-of-supply-chain-food-safety.

the high food safety and quality requirements of the company, which

includes the implementation of Hazard Analysis and Critical Control

Points (HACCP) and allergen control programs."

43.     Defendant understands how consumers interpret its safety

representations: "McDonald's customers expect and trust that, no matter where

they are in the world, McDonald's food is safe for them and their families. This trust

is one reason that food safety is McDonald's number one priority and a core part of

our mission - to serve safe and delicious food to our customers each and every

day."[20]

44.     In a recent SEC filing, McDonald's puts a great emphasis on it's the

safety and quality of its food and packaging. In fact, it is mentioned multiple times

as being part of the company's purpose:[21]

      a.  "The **safety and quality** of our food is a top priority and we are

          constantly innovating to strive to meet and exceed our customers'

          expectations. This also includes sourcing **quality** ingredients in

          responsible ways, supporting farming communities and evolving the

          Happy Meal to make balanced meals more accessible to families

          around the globe."

---

[20] McDonald's Official Website, *Food Safety, Everyone's Business*, https://corporate.mcdonalds.com/corpmcd/en-us/our stories/article/ourstories.world_food_safety.html.
[21] McDonald's 2021 Notice of Annual Shareholders' Meeting and Proxy Statement, "Our Impact and Brand Purpose" at 10. https://www.sec.gov/Archives/edgar/data/63908/000120677421001039/mcd_courtesy-pdf.pdf (filed April 8, 2021).

b. "McDonald's partners with a global network of suppliers and farmers to provide **quality ingredients and packaging materials**. By engaging our supply chain, we have greater visibility and together work toward commitments that support more sustainable production, so we can continue to serve our customers delicious meals they know and love."

45. Defendant's 2020 Annual Report prominently focuses on safety:[22]

a. "The Company has established and enforces **high food safety and quality standards.** The Company has quality centers around the world designed to promote consistency of its high standards. The quality management systems and processes not only involve ongoing product reviews, but also on-site and virtual supplier visits. A Food Safety Advisory Council, composed of the Company's internal food safety experts, as well as suppliers and outside academia, provides strategic global leadership for all aspects of food safety. We have ongoing programs to educate employees about food safety practices, and our suppliers and restaurant operators participate in **food safety trainings where we share best practices on food safety and quality.** In addition, the Company works closely with suppliers to encourage innovation and drive continuous improvement. Leveraging

---

[22] McDonald's Corporation Annual Report: 2020, https://corporate.mcdonalds.com/content/dam/gwscorp/assets/investors/financial-information/annual-reports/2020%20Annual%20Report.pdf (emphasis added).

scale, supply chain infrastructure and risk management strategies, the Company also collaborates with suppliers toward a goal of achieving competitive, predictable food and paper costs over the long term."

b. "Our ability to increase sales and profits depends on our System's ability to meet expectations for **safe food** and on our ability to manage the potential impact on McDonald's of food-borne illnesses and food or product safety issues that may arise in the future, including in the supply chain, restaurants or delivery. **Food safety is a top priority**, and we dedicate substantial resources to ensure that our customers enjoy **safe food products**, including as our menu and service model evolve."

46. This message is a core theme disseminated by Defendant to the public.

47. This theme is not new. Rather, it was Ray Kroc's original vision "to build a restaurant system known for consistently high-quality food and uniformity in its preparation methods" which would "enable the company to consistently offer its customers safe, high-quality food at an affordable price."[23]

48. From this long-term, widescale marketing focus, McDonald's Corporation represents to consumers throughout the country that its Products are safe from "farm to fork."

---

[23] Purdue University Center for Food and Agricultural Business, "Case Study: McDonald's Corporation" (2011) at 4, 9. Prepared by McDonald's Corporation and Kenneth McCorckle of Wells Fargo Bank.   https://agribusiness.purdue.edu/wp-content/uploads/2019/08/mcdonalds-case-study-2011.pdf.

**B.** **Defendant's Products Have Contained PFAs for Decades**

49.    In an effort to boost profits, McDonald's Corporation began using PFAS in its Products, and this practice has continued through many decades.

50.    For example, in the 1990's, McDonald's Corporation changed the packaging for its hash brown potatoes so that it would be lighter and take up less space in an effort to reduce costs.[24]

51.    Because the company shifted from a thick cardboard-like carton to a "paper bag," the company had problems with grease leaking.[25]

52.    To solve this issue, McDonald's Corporation added a 3M PFA called Scotchban FC-807.[26]

53.    The chemical stopped the grease problem and boosted McDonald's Corporation profits by millions of dollars each year.[27]

54.    This chemical has also been used in other McDonald's Corporation packaging including containers used for the McWaffle Sticks[28] and a similar compound was used for the Big Mac.[29]

55.    Approximately twenty years before Defendant's use of FC-807 in its packaging, 3M confirmed that mice fed FC-807 had 4,000 times the normal levels of organic fluorine compound.[30]

---

[24] NORMAN J. CRAMPTON, PREVENTING WASTE AT THE SOURCE (1998) at 6-8.
[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] PACKAGING WORLD, *Innovative paper packs recognized by 3M* (Oct. 31, 1999), https://www.packworld.com/issues/sustainability/news/13332367/innovative-paper-packs-recognized-by-3m.
[29] Jim Butschli, *Treated paper focuses on foodservice*, PACKAGING WORLD (Nov. 30, 1997), https://www.packworld.com/design/materials-containers/article/13329990/treated-paper-focuses-on-foodservice.
[30] *State of Minnesota v. 3M Co.*, Court File No. 27-CV-10-28862, Exhibit 1145 at 2, https://s3.documentcloud.org/documents/4570511/MN-3M-1977-Fluorine-in-Blood-Timeline.pdf.

56.     McDonald's Corporation's use of 3M's PFAS was so prominent that it was a finalist in the 1999 3M Scotchban Innovation Awards.[31]

57.     In February 2017, when researchers detected PFAS in McDonald's packaging, it "denied the chain's packaging contained PFAS" and claimed that "[o]ur packaging is safe for its intended use…"[32]

58.      In November 2018, McDonald's Corporation denied the use of PFAS in its Products and declared that they were safe.[33]

59.     After decades of use, finally in 2021, McDonald's Corporation admitted that it uses PFAS in its Products.[34]


### C.     Defendant's Products Contain High Levels of PFAS

60.     Rather than delivering food safety in each Product, Defendant delivers Products that contain high levels of PFAS.

61.     Despite the multiple proclamations that McDonald's Products did not contain PFAS, numerous recent studies have shown the opposite.

---

[31] PACKAGING WORLD, *supra* note 29 ("And a notable finalist in the awards program was the McWaffle Sticks carton for Oak Brook, IL-based McDonald's Corp. Supplied by Westvaco (New York, NY), the carton is treated with Scotchban protectors FC-807 and FC-807A to keep syrup from staining the paperboard and to preserve product crispness").

[32] The Dallas Morning News, *Which fast-food wrappers may have more dangerous chemicals than others?* (Feb. 2, 2017), https://www.dallasnews.com/business/local-companies/2017/02/02/which-fast-food-wrappers-may-have-more-dangerous-chemicals-than-others/.

[33] Tiffany Kary and Christopher Cannon, *Cancer-linked Chemicals Manufactured by 3M Are Turning Up in Drinking Water*, BLOOMBERG (Nov. 2, 2018), https://www.bloomberg.com/graphics/2018-3M-groundwater-pollution-problem/. "A spokeswoman for McDonald's said its packaging doesn't contain PFAS…" *Id.*

[34] Mitchell Willets, *McDonald's vows to stop using potentially harmful chemicals in packaging*, MIAMI HERALD (Jan. 13, 2021), https://www.miamiherald.com/news/nation-world/national/article248493160.html.

62.    In 2020, Toxic Free Future tested Defendant's Products and found high levels of PFAS in the packaging for the Big Mac, the French fries, and cookies.[35]



63.    In 2022, Consumer Reports published a study that confirmed the presence of high levels of PFAS in McDonald's Corporation's Products.[36]

64.    The study found high level of PFAS in the following items:

| McDonald's | | | |
|---|---|---|---|
| Bag for french fries | ■ ■ | | 250.3 |
| Bag for cookies | ■ ■ | | 250.0 |
| Bag for Chicken McNuggets | ■ ■ | | 219.0 |
| Container for Big Mac | ■ ■ | | 195.3 |

65.    The levels indicate the level of organic fluorine present in the item and is represented in parts per million (PPM).

66.    Notably, these Products are primarily the same items that were revealed to contain high levels of PFAS in the 2020 study..

67.    McDonald's Corporation intentionally uses PFAS on its Products to increase profits through a combination of reduced costs by using lower cost packaging and increased sales by concealing the presence of PFAS.

---

[35] Jen Dickman, Erika Schreder, and Nancy Uding, *Packaged in Pollution: Are food chains using PFAS in packaging?*, TOXIC-FREE FUTURE, https://toxicfreefuture.org/packaged-in-pollution/.

[36] Kevin Loria, *Dangerous PFAS Chemicals Are in Your Food Packaging*, CONSUMER REPORTS (Mar. 24, 2022), https://www.consumerreports.org/pfas-food-packaging/dangerous-pfas-chemicals-are-in-your-food-packaging-a3786252074.

68.     The presence of PFAS in the Products is material to Plaintiff, customers, and Class Members.

## D.    PFAS Are Toxic and Pose Substantial Health Risks to Humans and the Environment

69.     PFAS are synthetic chemicals that do not exist naturally in the environment. They have been used for decades in industrial processes and to produce consumer, household, and commercial products.

70.     PFAS are "long lasting chemicals, components of which break down very slowly over time."[37]

71.     "One common characteristic of concern of PFAS is that many break down very slowly and can build up in people, animals, and the environment over time.[38]

72.     Humans are more efficient at processing PFAS than the environment – which can take over a 1000 years to eliminate.

73.     While more efficient, it can still take multiple years to completely excrete long-chain PFAS and months to completely excrete short-chain PFAS.[39]

74.     As a point of comparison, consumers are concerned about the presence of bisphenol-a (BPA) in consumer products which is fully excreted in a few *hours*.[40]

---

[37] PFAS Explained, EPA, https://www.epa.gov/pfas/pfas-explained.
[38] Our Current Understanding of the Human Health and Environmental Risks of PFAS, EPA, https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas.
[39] Nicole W., *Breaking It Down: Estimating Short-Chain PFAS Half-Lives in a Human Population*, ENVIRON HEALTH PERSPECT. 2020;128(11):114002, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7657368/.
[40] Genuis SJ, Beesoon S, Birkholz D, Lobo RA., *Human excretion of bisphenol A: blood, urine, and sweat (BUS) study*, J. ENVIRON PUBLIC HEALTH, 2012;2012:185731, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3255175/.

75. Consumer products manufactured with PFAS were often promoted as being resistant to heat and stains, long-lasting, and capable of repelling water, oil, and grease. Companies have utilized PFAS to make, among other things, carpets, clothing, fabrics for furniture, paper packaging for food, and other materials such as cookware that are resistant to water, grease, or stains.

76. Although there are thousands of unique PFAS in existence, the details of many of these compounds are proprietary and known only to manufacturers and industrial users. But, what all PFAS share is that they contain multiple carbon-fluorine bonds, considered one of the strongest in chemistry, making them highly persistent in the environment and in human and animal bodies. In addition, the shared, characteristic chemistry common to all PFAS confers on each of these compounds hydrophobic and oleophobic properties, making PFAS effective surface protectors.[41]

77. PFAS are extremely soluble in water, which has led to their discovery in groundwater, rivers, and the ocean, as well as drinking water resources, fish, and marine mammals.

78. PFAS can be categorized as either "long-chain" or "short-chain" based on the number of carbon atoms they contain. Long-chain PFAS contain 7 or more carbon atoms, while PFAS containing fewer than 7 carbon atoms are considered short chain.

79. Long-chain PFAS such as perfluorooctanoic acid (PFOA) and perfluorooctane sulfonate (PFOS) have been widely detected in environmental samples, wildlife, and humans across the globe. Long-chain PFAS bioaccumulate and bio-magnify in both humans and in wildlife.

---

[41] *See* Per- and Polyfluoroalkyl Substances (PFAS), Nat'l Toxicology Program, https://ntp.niehs.nih.gov/whatwestudy/topics/pfas/index.html.

80.     In the Stockholm Convention on Persistent Organic Pollutants, PFOS is listed in Annex B. Annex B consists of persistent organic pollutants whose production, use, import, and export the Convention aims to restrict.

81.     The European Union specifically regulates products containing PFAS, restricting the manufacture or import of products containing more than 25 parts per billion (ppb) of PFOA.

82.     In October 2021, the US government announced its "PFAS Strategic Roadmap," which is an interagency plan to combat the continued use and release of PFAS. As part of the Strategic Roadmap, the Environmental Protection Agency (EPA) committed to designating PFOA and PFOS as "hazardous substances" under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA); finalizing a PFAS reporting rule under the Toxic Substances Control Act (TSCA) section 8(e); and publishing toxicity assessments for 7 widely-used PFAS, including the short-chain compound GenX, PFBA, PFHxA, PFHxS, PFNA, and PFDA.

83.     Following announcement of the Strategic Roadmap, a majority of the EPA's Science Advisory Board (SAB) agreed with the EPA that PFOA is a "likely carcinogen," with some members supporting a designation of "carcinogen." For PFOS, the SAB indicated that the evidence supports a label of "likely carcinogen."

84.     Short-chain PFAS unfortunately pose health and safety risks that are similar to their long-chain counterparts.

85.     Short-chain PFAS consist of multiple carbon-fluorine bonds, which, like long-chain PFAS, makes them highly persistent in the environment. They also bioaccumulate in human and animal bodies.

86. A 2019 study conducted by the U.S. Department of Health and Human Services' National Toxicology Program found that short-chain PFAS have the same adverse effects as long-chain compounds. This study determined that both long and short-chain PFAS compounds affect the same organ systems, with the greatest impact observed in the liver and thyroid hormone.[42]

87. Humans may be exposed to PFAS through a variety of pathways, including ingestion, inhalation, and skin absorption. Studies dating back at least a decade have indicated that PFAS can be absorbed through skin, with evidence showing that PFAS in the blood increase after application to skin.[43]

88. Many PFAS, both long and short chain, are toxic to humans at extremely low levels. Exposure to certain PFAS is associated in the medical and scientific literature with harmful and serious health effects in humans and animals, including but not limited to: (a) altered growth; (b) impacts to learning and behavior of infants and older children; (c) lowering a woman's chance of getting pregnant; (d) interference with the body's natural hormones; (e) increased cholesterol levels; (f) modulation of the immune system; (g) testicular and kidney cancers; (h) thyroid disease; (i) high uric acid levels; (j) elevated liver enzymes; (k) ulcerative colitis; and (l) pregnancy-induced hypertension.

---

[42] *Id.*

[43] Hillary L. Shane, Rachel Baur, Ewa Lukomska, Lisa Weatherly, Stacey E. Anderson, *Immunotoxicity and allergenic potential induced by topical application of perfluorooctanoic acid (PFOA) in a murine model*, Food and Chemical Toxicology, Vol. 136 (2020), https://www.sciencedirect.com/science/article/abs/pii/S0278691520300016.
.

89.     The International Agency for Research on Cancer (IARC) has classified PFOA as possibly carcinogenic to humans.[44]

90.     There is also evidence in the scientific literature that PFAS exposure is positively correlated with certain metabolic diseases, such as diabetes, overweight, obesity, and heart disease.

91.     The Center for Disease Control's Agency for Toxic Substances and Disease Registry has recognized that exposure to PFAS may impact the immune system and reduce antibody response to vaccines.[45] This is especially significant given the current public health risks posed by COVID-19 and efforts to protect against the virus with vaccines.

92.     PFAS are capable of crossing the placenta, meaning pregnant women transfer PFAS to their unborn children. Women exposed to PFAS during pregnancy have higher risks of gestational diabetes and pre-eclampsia, and their babies are more likely to undergo abnormal growth in utero, leading to low birth weight, and later face an increased risk of childhood obesity and infections.

---

[44] *See* World Health Organization, *Perfluorooctanoic acid*, https://monographs.iarc.who.int/wp-content/uploads/2018/06/mono110-01.pdf.
[45] *What are the health effects of PFAS?,* Agency for Toxic Substances and Disease Registry (June 24, 2020), https://www.atsdr.cdc.gov/pfas/health-effects/index.html.

93.     Research by professors at Harvard's T.H. Chan School of Public Health

shows that babies breastfed by mother's exposed to PFAS suffer significant

consequences:[46]

> "They found that, in children who were exclusively breastfed, PFAS concentrations in the blood increased by roughly 20%–30% each month, with lower increases among children who were partially breastfed. **In some cases, by the end of breastfeeding, children's serum concentration levels of PFASs exceeded that of their mothers'**."

94.     A figure from the European Environmental Agency ("EEA") shows the

"[e]ffects of PFAS on human health":[47]



---

[46]Harvard T.H. Chan Sch. of Pub. Health, *Breastfeeding may expose infants to toxic chemicals* (Aug. 20, 2015), https://www.hsph.harvard.edu/news/press-releases/breastfeeding-may-expose-infants-to-toxic-chemicals/ (emphasis added).

[47] *Emerging chemical risks in Europe — 'PFAS'*, EUR. ENV'T AGENCY (Dec. 12, 2019), https://www.eea.europa.eu/publications/emerging-chemical-risks-in-europe.

95.     The EEA article further explained that "[p]eople most at risk of adverse health impacts are those exposed to high levels of PFAS, and vulnerable population groups such as children and the elderly."[48]

96.     The danger of PFAS is well known. On September 20, 2020, a New York Times article titled, "These Everyday Toxins May Be Hurting Pregnant Women and Their Babies" reported on the dangers of PFAS—particularly during gestation and in early childhood development:[49]

> **Scientists think these widely used industrial chemicals may harm pregnant women and their developing babies by meddling with gene regulators and hormones that control two of the body's most critical functions: metabolism and immunity.**
>
> More disturbing, PFAS can also alter levels of both mothers' and babies' thyroid hormones, which oversee brain development, growth and metabolism, and also play a role in immunity. Prenatal PFAS exposures that disrupt metabolism and immunity may cause immediate and lasting effects on both mother and child. Women exposed to PFAS during pregnancy have higher risks of gestational diabetes and pre-eclampsia, a type of high blood pressure. Their babies are more likely to undergo abnormal growth in utero, leading to low birth weight, and later face increased risk of childhood obesity and infections.

97.     Additionally, according to the EEA:[50]

> Costs to society arising from PFAS exposure are high, with the annual health related costs estimated to be EUR 52-84 billion across Europe in a recent study (Nordic Council of Ministers, 2019). The study notes that these costs are likely underestimated, as only a limited range of health effects (high cholesterol, decreased immune system and cancer) linked to exposure to a few specific PFAS were included in the estimates.

---

[48] *Id.*

[49] Liza Gross, *These Everyday Toxins may be Hurting Pregnant Women and Their Babies*, N.Y. TIMES (Sept. 23, 2020), https://www.nytimes.com/2020/09/23/parenting/pregnancy/pfas-toxinschemicals.html.

[50] EEA, *supra* note 47.

98.     This analysis has yet to be performed in the United States of America; however, there is no reason to believe the conclusions would differ.

99.     "The Madrid Statement," a scientific consensus regarding the persistence and potential for harm of PFAS substances issued by the Green Science Policy Institute and signed by more than 250 scientists from 38 countries, recommended the following actions in order to mitigate future harm: (1) discontinuing use of PFAS where not essential or safer alternatives exist; (2) labeling products containing PFAS; and (3) encouraging retailers and individual consumers to avoid products containing or manufactured using PFAS whenever possible.[51]

100.    Researchers have begun to find significant increases of certain short-chain PFAS in the blood of sample populations, raising concerns that short-chain PFAS are assuming the body burden once exclusively occupied by long-chain compounds.

101.    Consumers are rightfully concerned about the presence or risk of PFAS in various products.

102.    However, PFAS are essentially unregulated at the federal level. For example, the Safe Drinking Water Act ("SDWA") protects public water supplies across the U.S. and is enforced by the Environmental Protection Agency (EPA). Under this law, the EPA has not (although it could) formally created a Maximum Contaminant Level for PFAS in the water supply. Rather, the EPA has issued a health advisory for PFOA and PFOS that serve as "informal technical guidance" to assist government

---

[51] Arlene Blum et al., *The Madrid Statement*, GREEN SCI. POL'Y INST., https://greensciencepolicy.org/our-work/science-policy/madrid-statement/.

officials and water system managers in sampling and treating PFOA and PFOS in drinking water.[52]

103.    Over the past decade, several states have enacted maximum contaminant levels regulating certain PFAS, including PFOA and PFOS, in drinking water.

104.    California has been on the forefront of enacting legislation to manage and lessen the health and safety risks of PFAS for its citizens.

105.    The California Office of Environmental Health Hazard Assessment (OEHHA), for example, has proposed a Public Health Goal for PFOA in drinking water of 0.007 parts per trillion (ppt) and a Public Health Goal for PFOS of 1 ppt.[53]

106.    California Health and Safety Code 116378 provides that the state can order public water systems to monitor for PFAS. California's Proposition 65 requires products to carry a warning that they contain PFOA and PFOS if they are sold in California and, if not, private enforcement action is permitted. In 2020, California began requiring public water suppliers to notify customers if their water contains PFAS.

107.    In October 2020, California passed a law titled the Toxic Free Cosmetics Act, Assembly Bill 2762, that, starting January 1, 2025, will prohibit the manufacturing or selling of any cosmetic product with any intentionally added amount of 24 specified chemicals, including PFAS.

---

[52] *PFAS Laws and Regulations*, U.S. Environmental Protection Agency, https://web.archive.org/web/20210325235307/https://www.epa.gov/pfas/pfas-laws-and-regulations.

[53] *Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonic Acid (PFOS) in Drinking Water*, California Office of Environmental Health Hazard Assessment (Oct. 5, 2021), https://oehha.ca.gov/water/report/perfluorooctanoic-acid-pfoa-and-perfluorooctane-sulfonic-acid-pfos-drinking-water.

108.    In March 2021, California's OEHHA released a Notice of Intent to list PFOA as a carcinogen under Proposition 65. In December 2021, the OEHHA approved the listing of PFOS as a carcinogen under Proposition 65.

109.    California recently passed legislation banning the use of PFAS in paper-based food packaging as well as the disclosure of the presence of PFAS in cookware.[54] This bill, Assembly Bill 1200, builds off similar food-packaging legislation passed in 2020 in New York.[55]

110.    The State of New York was one of the first to recognize that PFAS were harmful to humans and should be regulated. In 2016, it took steps to regulate when and how PFAS could knowingly be released into the environment, for example for firefighting purposes.[56] Then, in 2020, New York enacted a law prohibiting the sale of food packaging containing PFAS, effective Dec. 31, 2022.[57]

111.    Similarly, in July of 2021, the State of Connecticut signed a bill into law banning the use of firefighting foam and food packaging that contains PFAS.[58] An even broader law was passed in Maine in July 2021 that bans PFAS in nearly all products,

---

[54] Avinash Kar, *CA Bill to Reduce Toxic PFAS Exposures Passed by Legislature*, Natural Resources Defense Council (Sep. 7, 2021), https://www.nrdc.org/experts/avinash-kar/ca-bill-reduce-toxic-pfas-exposures-passed-legislature.

[55] *Id.*

[56] *Per- and Polyfluoroalkyl Substances (PFAS)*, Department of Environmental Conservation, https://www.dec.ny.gov/chemical/108831.html.

[57] *New York Bans PFAS in Food Packaging*, National Law Review, Volume X, Number (Dec. 15, 2020), https://www.natlawreview.com/article/new-york-bans-pfas-food-packaging.

[58] *Governor Lamont Signs Legislation Banning Use Of PFAS-Containing Firefighting Foam in October, Phases Out PFAS-Containing Food Packaging In 2023*, The Office of Govenor Ned Lamont (Jul 20, 2021), https://portal.ct.gov/Office-of-the-Governor/News/Press-Releases/2021/07-2021/Governor-Lamont-Signs-Legislation-Banning-Use-Of-PFAS.

stating as of Jan. 1, 2030, "a person may not sell, offer for sale or distribute for sale" in Maine products where PFAS has been "intentionally added" except in cases of "unavoidable use."[59] Similar legislation has also been passed in Vermont and Washington.[60]

112.    In 2018, 3M reached an $850 million settlement with the State of Minnesota brought by the Attorney General alleging that 3M's production of PFAS damaged the drinking water and resources throughout the Minneapolis/St. Paul area, including within residential areas.[61]

113.    A similar personal injury case was filed on behalf of citizens of West Virginia against DuPont related to discharges of PFAS from a manufacturing site into local water sources. That case settled in 2017 for $671 million.[62]

114.    In 2021, DuPont, Chemours and Corteva reached a $4 billion settlement over PFAS liabilities,[63] in addition to a $83 million settlement with plaintiffs in Ohio for personal injury claims.

---

[59] Sebastien Malo, *Maine outlaws PFAS in products with pioneering law*, REUTERS (Jul. 16, 2021), https://www.reuters.com/legal/litigation/maine-outlaws-pfas-products-with-pioneering-law-2021-07-16/.

[60] *Connecticut and Vermont Ban PFAS in Food Packaging*, NATIONAL LAW REVIEW, Volume XI, Number 182 (Jul. 1, 2021), https://www.natlawreview.com/article/connecticut-and-vermont-ban-pfas-food-packaging.

[61] Minnesota 3M PFAS Settlement, https://3msettlement.state.mn.us/.

[62] Arathy S Nair, *DuPont settles lawsuits over leak of chemical used to make Teflon*, REUTERS (Feb. 13, 2017), https://www.reuters.com/article/us-du-pont-lawsuit-west-virginia/dupont-settles-lawsuits-over-leak-of-chemical-used-to-make-teflon-idUSKBN15S18U.

[63] *DuPont, Chemours and Corteva Reach $4 Billion Settlement on 'Forever Chemicals' Lawsuits*, EWG (Jan. 22, 2021), https://www.ewg.org/news-insights/news-release/dupont-chemours-and-corteva-reach-4-billion-settlement-forever-chemicals.

115.    As the risks associated with PFAS become more widely known, it is likely that consumer awareness will continue to grow. It is reasonable for consumers to be concerned about these chemicals, which carry significant health risks and are often undisclosed by manufacturers.

E.    **The Use of PFAS in Food Packaging**

116.    PFAS have been used in food packaging since the 1940s due to their water-resistant and grease-resistant properties.[64]

117.    PFAS that are in food packaging have been shown to migrate into the food.[65]

118.    As Justin Boucher of The Food Packaging Forum summarizes: "[w]e know that that these substances migrate into food that you eat. It's clear, direct exposure."[66]

119.    Migration from packaging into the food item "increases with higher temperatures, longer contact time, and the presence of emulsifiers."[67]

120.    Further, migration is more likely to occur where foods have high levels of fat and sodium.[68]

121.    All of these factors are present in fast food environments including at Defendant's restaurants.

---

[64] Ramírez Carnero A, Lestido-Cardama A, Vazquez Loureiro P, Barbosa-Pereira L, Rodríguez Bernaldo de Quirós A, Sendón R., *Presence of Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS) in Food Contact Materials (FCM) and Its Migration to Food*, Foods. 2021; 10(7):1443, http://www.mdpi.com/2304-8158/10/7/1443

[65] T. H. Begley, W. Hsu, G. Noonan & G. Diachenko (2008) *Migration of fluorochemical paper additives from food-contact paper into foods and food simulants*, Food Additives & Contaminants: Part A, 25:3, 384-390, https://www.tandfonline.com/doi/abs/10.1080/02652030701513784.

[66] Loria, *supra* note 36.

[67] Begley, *supra* note 65.

[68] Ramírez, *supra* note 64.

122. For decades, McDonald's Corporation has been under fire for high levels of sodium and fat in its food items.[69]

123. Studies show that consumption of restaurant food and popcorn is associated with higher blood concentrations of PFAS that is attributed to migration from food packaging.[70]

124. The presence of PFAS in food packaging is not incidental; rather, it is intentional.

125. As noted by Dr. Rainer Lohmann, "If a product is showing really high fluorine levels, companies really can't claim they didn't use PFAS."[71]

126. Alternatives to using PFAS exist, but they come at higher costs for food companies.[72]

127. In pursuit of higher profits, many restaurants – like McDonald's Corporation – cut corners by using PFAs to the detriment of consumers and the public.

---

[69] *See, e.g.,* Jack Beresford, *McDonald's Fans Divided on Video Showing How Fries Are Made—'So Much Salt'*, NEWSWEEK (Feb. 2, 2022), https://www.newsweek.com/mcdonalds-fans-divided-video-showing-fries-recipe-1675053. *and* Marian Burros, *EATING WELL; McDonald's Fat Debate Goes On*, The New York Times (Sep. 11, 2002), https://www.nytimes.com/2002/09/11/dining/eating-well-mcdonald-s-fat-debate-goes-on.html.

[70] Susmann, H.P.; Schaider, L.A.; Rodgers, K.M.; Rudel, R.A. *Dietary habits related to food packaging and population exposure to PFASs*. ENVIRON. HEALTH PERSPECT. 2019, 127, 107003, https://ehp.niehs.nih.gov/doi/full/10.1289/EHP4092.

[71] Joe Fassler, *The bowls at Chipotle and Sweetgreen are supposed to be compostable. They contain cancer-linked "forever chemicals."*, THE COUNTER (Aug. 5, 2019), https://thecounter.org/pfas-forever-chemicals-sweetgreen-chipotle-compostable-biodegradable-bowls/.

[72] OECD (2020), *PFASs and Alternatives in Food Packaging (Paper and Paperboard) Report on the Commercial Availability and Current Uses*, OECD Series on Risk Management, No. 58, Environment, Health and Safety, Environment Directorate, OECD., https://www.oecd.org/chemicalsafety/portal-perfluorinated-chemicals/PFASs-and-alternatives-in-food-packaging-paper-and-paperboard.pdf; Pat Rizzuto, *PFAS in Food Packaging Driven by Costs of Substitutes, OECD Says*, Bloomberg Law (Sept. 25, 2020), https://news.bloomberglaw.com/environment-and-energy/pfas-in-food-packaging-driven-by-costs-of-substitutes-oecd-says.

128. This "profits over people" approach passes the costs from McDonald's Corporation and places it on McDonald's customers and the general public.

129. Rather than pay increased costs of a few cents per unit, McDonald's Corporation shifts these costs to consumers throughout the country.

130. The costs will ultimately be paid by multiple generations of Americans with health and environmental ailments caused by exposure to PFAS.

**F.     Defendant's Misrepresentations and Omissions Are Actionable**

131. Plaintiff and the Class Members reasonably relied to their detriment on Defendant's misleading representations and omissions.

132. Defendant's false, misleading, and deceptive misrepresentations and omissions are likely to continue to deceive and mislead reasonable consumers as they have already deceived and misled the Plaintiff and the Class Members.

133. Defendant misrepresents that its Products are safe when they contain dangerous PFAS.

134. This is not only implied by Defendant selling a food item but also through a widescale marketing campaign and brand that expresses food safety.

135. The presence of PFAS in the Products has been confirmed by multiple studies including studies published as recently as March 2022.

136. Further, for many decades, Defendant concealed its use of PFAS in the Products by denying it used PFAS.

137. These misrepresentations and omissions were done to increase Defendant's profits.

138. Plaintiff and the Class were injured by the full purchase price of the Products because the Products are worthless, as they are adulterated and contain harmful levels of PFAS, and Defendants failed to warn or misrepresented this fact to consumers. Such illegally sold Products are worthless and have no value.

139. Plaintiff and Class Members bargained for food products that are free of contaminants and dangerous substances and were deprived the basis of their bargain when Defendants sold them a product containing dangerous PFAS, which rendered the Products unmerchantable and unfit for use.

140. No reasonable consumer would expect that a product marketed as safe would contain dangerous PFAS—which scientific studies indisputably link to harmful health effects in humans. Accordingly, Plaintiff and Class Members suffered economic injuries as a result of purchasing the Products.

141. As the Products expose consumers to PFAS that pose a risk to both consumers' health and the environment, the Products are not fit for use by humans. Plaintiff and the Class Members are further entitled to damages for the injury sustained in being exposed to high levels of toxic PFAS, damages related to Defendant's conduct, and injunctive relief.

142. As alleged herein, Plaintiff and the Class Members received something worth less than what they paid for and did not receive the benefit of their bargain. They paid for the Products, which were supposed to be safe for human consumption, but Plaintiff and the Class Members received Products that were unsafe for human consumption due to the presence of dangerous PFAS.

143. Plaintiff and the Class Members all paid money for the Products. However, Plaintiff and the Class Members did not obtain the full value of the advertised Products due to Defendant's misrepresentations and omissions. Plaintiff and the Class Members purchased, purchased more of, and/or paid more for, the Products than they would have had they known the truth about the Products. Consequently, Plaintiff and the Class Members have suffered injury in fact and lost money as a result of Defendant's wrongful conduct.

144.    Plaintiff seeks to recover damages because the Products are adulterated, defective, worthless, and unfit for human use due to the presence of PFAS.

## **TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS**

145.    Any applicable statute of limitations has been tolled by Defendant's knowing and active concealment of the presence or risk of PFAS in the Products and the misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiff and Class Members were deceived regarding the Products and could not reasonably discover that they contained PFAS.

146.    Plaintiff and Class Members did not discover and did not know of any facts that would have caused a reasonable person to expect that the Defendant was concealing the presence or risk of PFAS in the Products. As alleged herein, the presence or risk of PFAS was material to Plaintiff and Class Members at all relevant times. Within the time period of any applicable statute of limitations, Plaintiff and Members of the Class would not have discovered through the existence of reasonable diligence that the Products contain PFAS.

147.    At all times, Defendant is and was under a continuous duty to disclose to Plaintiff and the Class the true standard, quality, and grade of the Products and to disclose the presence of PFAS due to its exclusive and superior knowledge of the contents and ingredient sourcing for the Products.

148.    Defendant knowingly, actively, and affirmatively concealed the facts alleged herein. Plaintiff and Class Members reasonably relied on Defendant's knowing, active, and affirmative concealment.

149.    For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendant's fraudulent concealment, and

Defendant is estopped from relying on any statues of limitations in defense of this action.

## CLASS DEFINITIONS AND ALLEGATIONS

150.    Plaintiff, pursuant to Federal Rule of Civil Procedure 23, brings this action on behalf of the following classes (collectively, the "Class," "Classes," and "Class Members"):

a.    Multi-State Consumer Class: All persons in the States of California, Florida, Illinois, Massachusetts, Minnesota, Missouri, New Jersey, New York, Pennsylvania, Oregon, and Washington who purchased the Products.[73]

b.    Illinois Class: All persons who purchased Defendant's Product within the State of Illinois and within the applicable statute of limitations.

c.    Nationwide Class: All persons who purchased Defendant's Product within the United States and within the applicable statute of limitations period.

151.    Excluded from the Classes are Defendant, its parents, subsidiaries, affiliates, officers, and directors, those who purchased the Product for resale, all

---

[73] The States in the Multi-State Consumer Class are limited to those States with similar consumer protection laws under the facts of this case: California (Cal. Bus. & Prof. Code § 17200, et seq.); Florida (Fla. Stat. § 501.201, et seq.); Illinois (815 ILCS 505/1, et seq.); Massachusetts (Mass. Gen. Laws Ch. 93A, et seq.); Michigan (Mich. Comp. Laws § 445.901, et seq.); Minnesota (Minn. Stat. § 325F.67, et seq.); Missouri (Mo. Rev. Stat. 407.010, et seq.); New Jersey (N.J. Stat. § 56:8-1, et seq.); New York (N.Y. Gen. Bus. Law § 349, et seq.); Pennsylvania (73 Pa. Stat. Ann. §§ 201-1 et seq.); Oregon (Or. Rev. Stat. §§ 646.605, et seq.); and Washington (Wash Rev. Code § 19.86.010, et seq.).

persons who make a timely election to be excluded from the Classes, the judge to whom the case is assigned and any immediate family members thereof.

152.    The members of the Classes are so numerous that joinder of all Class Members is impracticable. Defendant has sold, at a minimum, over one hundred million units of the Products to Class Members.

153.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the putative classes that predominate over questions that may affect individual Class Members include, but are not limited to the following:

   a.   whether Defendant misrepresented material facts concerning the Products;

   b.   whether Defendant omitted material facts concerning the Products;

   c.   whether Defendant's conduct was unfair and/or deceptive;

   d.   whether Defendant has been unjustly enriched as a result of the unlawful, deceptive, fraudulent, and unfair conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon them by Plaintiff and the Class;

   e.   whether Plaintiff and the Class are entitled to equitable and/or injunctive relief;

   f.   whether Defendant breached express and implied warranties to Plaintiff and the Class; and

g.  whether Plaintiff and the Class have sustained damages with respect to the claims asserted, and if so, the proper measure of their damages.

154.   Plaintiff's claims are typical of those of other Class Members because Plaintiff, like all members of the classes, purchased Defendant's Products and sustained damages from Defendant's wrongful conduct.

155.   Plaintiff will fairly and adequately protect the interests of the classes and has retained counsel that is experienced in litigating complex class actions.

156.   Plaintiff has no interests which conflict with those of the classes.

157.   A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, making it impracticable for Class Members to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

158.    The prerequisites to maintaining a class action for equitable relief are met as Defendant has acted or refused to act on grounds generally applicable to the classes, thereby making appropriate equitable relief with respect to the classes as a whole.

159.    The prosecution of separate actions by members of the Classes would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant. For example, one court might enjoin Defendant from performing the challenged acts, whereas another might not. Additionally, individual actions could be dispositive of the interests of the classes even where certain Class Members are not parties to such actions.

## CAUSES OF ACTION

### COUNT I
### Violation of State Consumer Protection Statutes
### (On Behalf of the Multi-State Consumer Class)

160.    Plaintiff repeats and realleges each and every allegation above as if set forth herein.

161.    The Consumer Protection Acts of the States in the Multi-State Consumer Class prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

162.    Defendant intended that Plaintiff and the other members of the Multi-State Consumer Class would rely upon their deceptive conduct, and a reasonable person would in fact be misled by its deceptive conduct.

163.   As a result of the Defendant's use or employment of unfair or deceptive acts or business practices, Plaintiff, and other members of Multi-State Consumer Class, have sustained damages in an amount to be proven at trial.

**COUNT II**
**Violation of the Illinois Consumer Fraud and**
**Deceptive Business Practices Act ("ICFA"),**
**815 ILCS 502/1 et seq.**
**(In the Alternative to Count I and on behalf of the Illinois Class)**

164.   Plaintiff repeats and realleges each and every factual allegation contained in the foregoing paragraphs as if fully set forth herein.

165.   Plaintiff brings this claim individually and on behalf of the members of the proposed Illinois Class against the Defendant.

166.   The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1, et seq., prohibits any deceptive, unlawful, unfair, or fraudulent business acts or practices including using deception, fraud, false pretenses, false promises, false advertising, misrepresentation, or the concealment, suppression, or omission of any material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act." 815 ILCS 505/2.

167.   The ICFA applies to Defendant's acts as described herein because it applies to transactions involving the sale of goods or services to consumers. Defendant is a "person," as defined by 815 ILCS 505/1(c).

168.   Plaintiff is a "consumer," as defined by 815 ILCS 505/1(e), because he purchased McDonald's Products.

169.   McDonald's Products are "merchandise," as defined by 815 ILCS 505/1(b).

170.    Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding the Products, including the misrepresentation that their Products were safe for human consumption and the omission that their Products contained dangerous PFAS.

171.    Defendant's misrepresentations and omissions regarding the Products constitute deceptive and unfair acts or practices prohibited by the ICFA.

172.    Defendant's aforementioned misrepresentations and omissions have the tendency or capacity to mislead and create the likelihood of consumer confusion.

173.    Defendant's aforementioned misrepresentations and omissions were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of the Products (respectively) to Plaintiff and the Classes.

174.    Defendant's aforementioned misrepresentations and omissions are unfair business practices because they offend public policy and/or cause substantial injury to consumers.

175.    Also, the Illinois Consumer Fraud and Deceptive Business Practices Act protects consumers when purchasing products, including Defendant's Products, and provides that: Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . . 815 ILCS 505/2.

176.    Defendant intended that Plaintiff and Class Members rely on the above-referenced false statements, misrepresentations, and omissions of material fact in purchasing the Products.

177.    Plaintiff and Class Members reasonably relied on Defendant's respective misrepresentations and omissions when they bought the Products.

178. Had Plaintiff and Class Members been aware of the true facts regarding the presence of toxic PFAS in the Products, they would have declined to purchase the Products.

179. Plaintiff and Class Members suffered injuries in fact—i.e., the loss of the money that they paid for the Products under the belief that they were safe for human consumption and did not contain dangerous PFAS.

180. Acting as reasonable consumers, Plaintiff and Class Members could not have avoided the injuries suffered by purchasing the Products because they did not have any reason to suspect that McDonald's Products contained toxic PFAS. Moreover, the detection of PFAS requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not readily available to Plaintiff and Class Members at the time they purchased the Products.

181. As a direct and proximate result of Defendant's unfair and deceptive acts or practices, Plaintiff and Class Members suffered damages by purchasing the Products because they would not have purchased those brands of food products had they known the truth, and they received products that were worthless because they contain (or had a risk of containing) dangerous PFAS.

## COUNT III
### Breach of Express Warranties

182. Plaintiff repeats and realleges each and every factual allegation contained in the foregoing paragraphs as if fully set forth herein.

183. Plaintiff brings this claim individually and on behalf of the members of the proposed Nationwide Class against the Defendant.

184. As discussed above, Defendant promised and expressly warranted that the Products are safe.

185. Plaintiff and Class Members relied on these representations when purchasing Products.

186. These promises and affirmations of fact constitute express warranties that became part of the basis of the bargain between Plaintiff, Class Members, and the Defendant.

187. All conditions precedent to Defendant's liability under the contract, including notice, have been performed by Plaintiff and the Class Members.

188. Defendant has breached the terms of its express warranties by failing to provide the Products as warranted.

189. Defendant knowingly breached the express warranties by including PFAS in the Products.

190. Defendant was on notice of these breaches because it had knowledge of the defect because it intentionally included the PFAS into the Products.

191. Further, Plaintiff notified Defendant of these breaches through an email from counsel prior to the filing of this lawsuit.

192. As a result of Defendant's breach of its warranties, Plaintiff and others similarly situated have been damaged and seek damages in the amount of the purchase price of the Products.

## COUNT IV
### Breach of the Implied Warranty of Merchantability

193. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

194. Plaintiff asserts this claim individually and on behalf of the Nationwide Class.

195. Defendant is a "merchant" as defined under the U.C.C. and by the respective state statutes under which Plaintiff alternatively asserts this claim.

196.    The Products are "goods" as defined under the U.C.C. and by the respective state statutes under which Plaintiff alternatively brings this claim.

197.    There was a sale of goods from Defendant to Plaintiff and Class Members.

198.    At all times mentioned herein, Defendant manufactured, distributed, marketed, and sold the Products, and prior to the time such products were purchased by Plaintiff and the Class Members, Defendant impliedly warranted to them that the Products were of merchantable quality, fit for their ordinary use, and conformed to the promises and affirmations of fact made that the Products were healthy, wholesome, nutritious and safe for consumption.

199.    Plaintiff and the Class Members relied on Defendant's promises and affirmations of fact when they purchased the Products.

200.    The Products were not fit for their ordinary use, consumption by people, and did not conform to Defendant's affirmations of fact and promises as they contained high, dangerous amounts of PFAS.

201.    Defendant breached its implied warranties by selling the Products that failed to conform to the promises or affirmations of fact made concerning each Product because they contained dangerous PFAS.

202.    Defendant was on notice of these breaches because it had knowledge of the defect because it intentionally included the PFAS into the Products.

203.    Further, Plaintiff notified Defendant of these breaches through an email from counsel prior to the filing of this lawsuit.

204.    Privity exists because Defendant sold the Products to the Plaintiff and Class Members. Further, Defendant expressly warranted to Plaintiff and the Class Members that the Products were safe for consumption, which was untrue as described hereinabove. Defendant knew that consumers such as Plaintiffs and the Class Members would be the end purchasers of the Products and the target of their marketing. Defendant intended its marketing to be considered by the end purchasers of the Products, including Plaintiff and the Class Members. Defendant directly marketed to Plaintiff and the Class Members.

205.    As a direct and proximate result of Defendant's conduct, Plaintiff and the Class Members have suffered actual damages in that they have purchased the Products which are worth less than the price they paid and that they would not have purchased at all had they known of the presence of dangerous PFAS.

206.    Plaintiff and the Class Members seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendant's failure to deliver goods conforming to their implied warranties and resulting breach.

## COUNT V
### Violation of the Magnusson-Moss Warranty Act,
### 15 U.S.C. §§ 2301 et seq. ("MMWA")

207.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

208.    Plaintiff asserts this claim individually and on behalf of the Nationwide Class.

209.    Plaintiff and Class Members are "consumers" within the meaning of the MMWA. 15 U.S.C. § 2301(3).

210.    The Products are "consumer products" within the meaning of the MMWA. 15 U.S.C. § 2301(1).

211.    Defendant is a "supplier" and "warrantor" within the meaning of the MMWA. 15 U.S.C. § 2301(4)-(5).

212.    Defendant's express warranties are written warranties within the meaning of Section 2301(6) of the MMWA. The Products' implied warranties are accounted for under Section 2301(7) of the MMWA. Defendant cannot disclaim implied warranties under the MMWA because Defendant knowingly sold a defective product without informing consumers about the defects.

213.    As set forth herein, Defendant breached its warranties with Plaintiff and Class Members.

214.    The Products share common defects in that they are unsafe and unfit for human consumption.

215.    Defendant had knowledge of these defects at the time the Products were delivered to Plaintiff and the Class Members because Defendant intentionally used PFAS in each Product.

216.    Prior to the filing of this Complaint, Plaintiff sent a pre-suit notice concerning the defects described herein and consumers' experiences with the defects to both Defendant and retailer.

217. As a direct and proximate result of Defendant's breach of implied and express warranties pursuant to 15 U.S.C. § 2310(d)(1), Plaintiff and Class Members have suffered damages in an amount to be proven at trial.

218. The amount in controversy for the Plaintiff's and Class Members' individual claims meets or exceeds the sum of $25. The total amount in controversy of this action in sum exceeds $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

219. Plaintiff and Class Members are entitled to recover damages as a result of Defendant's breach of warranties.

220. Plaintiff and Class Members are also entitled to seek costs and expenses, including attorneys' fees, under the MMWA. 15 U.S.C. § 2310(d)(2).

## COUNT VI
### Unjust Enrichment

221. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

222. Plaintiff brings this claim individually and on behalf of the Nationwide Class against the Defendant.

223. At all times relevant hereto, Defendant deceptively marketed, advertised, and sold merchandise to Plaintiff and the Class.

224. Plaintiff and members of the Class conferred upon Defendant nongratuitous payments for the Products that they would not have if not for Defendant's deceptive advertising and marketing. Defendant accepted or retained the nongratuitous benefits conferred by Plaintiff and members of the Class, with

full knowledge and awareness that, as a result of Defendant's deception, Plaintiff and members of the Class were not receiving a product of the quality, nature, fitness, or value that had been represented by Defendant and reasonable consumers would have expected.

225.    Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff's and Class Members' purchases of the Products. Retention of those monies under these circumstances is unjust and inequitable because of Defendant's misrepresentations about the Products, which caused injuries to Plaintiff and Class Members because they would not have purchased the Products if the true facts had been known.

226.    Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiff and members of the Classes is unjust and inequitable, Defendant must pay restitution to Plaintiff and members of the Class for its unjust enrichment, as ordered by the Court.

## RELIEF DEMANDED

227.    WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Classes and Plaintiff's attorneys as Class Counsel to represent the members of the Classes;

b. For an order declaring the Defendant's conduct violates the statutes and laws referenced herein;

c. For an order awarding, as appropriate, compensatory and monetary damages, restitution or disgorgement to Plaintiff and the Classes for all causes of action;

d. For an order requiring Defendant to immediately cease and desist from selling their misbranded Products in violation of law; enjoining Defendant from continuing to label, market, advertise, distribute, and sell the Products in the unlawful manner described herein; and ordering Defendant to engage in corrective action;

e. For prejudgment and postjudgment interest on all amounts awarded;

f. For an order awarding punitive damages; and

g. For an order awarding attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: March 28, 2022

Respectfully submitted,

By: /s/ Steffan T. Keeton

Steffan T. Keeton
**The Keeton Firm LLC**
100 S Commons, Suite 102
Pittsburgh, PA 15212
Telephone: (888) 412-5291
stkeeton@keetonfirm.com

*Counsel for Plaintiff and the Class*